UNITED STATES of America,
Plaintiff–Appellee,

v.

John C. BEST, Gregory J. Bewick, and
Paul F. Conarty,
Defendants–Appellants.

Nos. 87–2456, 87–2457 and 87–2458.

United States Court of Appeals,
Seventh Circuit.

Argued April 5, 1990.

Decided July 3, 1990.

Anton R. Valukas, U.S. Atty., Jeanne M. Witherspoon, Asst. U.S. Atty., Office of the U.S. Atty., David J. Stetler, James R. Ferguson, Victoria J. Peters, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

James S. Montana, Jr., Lydon & Griffin, George P. Lynch, M. Jacqueline Walther, Kielian & Walther, Mary Ellen Dienes, Chicago, Ill., for John C. Best.

James S. Montana, Jr., Susan G. Feibus, Lydon & Griffin, M. Jacqueline Walther, Kielian & Walther, Mary Ellen Dienes, Chicago, Ill., for Gregory J. Bewick.

Sidney Z. Karasik, Lydon & Griffin, M. Jacqueline Walther, Kielian & Walther, Mary Ellen Dienes, Chicago, Ill., for Paul F. Conarty.

Before CUMMINGS, POSNER, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

The defendants were indicted on 35 counts of mail fraud, misapplication of bank funds, bank fraud, and related crimes committed in the course of the failure of the American Heritage Savings and Loan Association, a federally insured institution of which the defendants were officers. The trial lasted seven weeks, and the jury found the defendants guilty on most counts. The judge sentenced John Best to a year and a day in prison, Gregory Bewick to six months on work release, and Paul Conarty to probation.

American Heritage failed in 1983. Best was its chief executive officer, Bewick its second in command, and Conarty, a recent addition, its in-house counsel. The bank (as we shall call it, for though it was really a savings and loan association nothing in this case turns on the differences between the two types of banking institution) had been in a parlous state since 1981. It is the efforts of Best and Bewick, later joined by Conarty, to stave off the evil day that gave rise to this prosecution.

Through Landfinder's Realty Corporation and other wholly owned subsidiaries, the bank owned a great deal of unpromising commercial real estate, mainly undeveloped, on which the defendants' efforts to disguise the bank's deteriorating financial condition focused. Among many practices in which Best and Bewick engaged that violated the norms of the banking business, they would approve the making of loans that were conditioned on the borrower's agreeing to buy real estate from one of the bank's subsidiaries, and would then apply to the down payment for the purchase of the real estate so much of the loan as was necessary to cover the down payment completely. By this tactic, they were, in effect, selling the bank's real estate to the borrower—who typically was uncreditworthy, and known to Best and Bewick to be so—for no cash down. Selling it, moreover, at inflated prices, based on inflated appraisals, so that the bank could book a profit on the sales and thereby improve its balance sheet, even though it was extremely unlikely that the borrower-buyer would ever complete the payments for the property or that, if he did not, the property could be sold for a price equal to the purchase price, or for that matter equal to the loan. While engaging in these reckless transactions, which predictably flopped, and while the bank was losing money hand over fist, Best and Bewick were paying themselves large bonuses from the Landfinder's account.

The evidence was ample to convict Best and Bewick of the offenses with which they were charged, with the possible exception of the counts relating to the payment of bonuses from the Landfinder's account. The source of Landfinder's revenue, it is true, was not really the proceeds of the sale of real estate owned by Landfinder's and other nonbanking real estate subsidiaries of the bank, because the purchasers paid nothing for the real estate—the sales generated no proceeds. The actual source of the real estate subsidiaries' revenue, and hence of the bonuses, was the bank funds that Best and Bewick loaned to the purchasers of the real estate and then applied to the down payment on the sales. Bank funds thus trickled back to Best and Bewick from Landfinder's, having been, in effect, lightly laundered. It is a crime for

an officer of a bank to receive money from a bank transaction with intent to defraud the bank, 18 U.S.C. § 1006, and the officer must not be allowed to evade this prohibition by laundering the money. *United States v. Payne*, 750 F.2d 844, 858 (11th Cir.1985). Such receipt is also a violation of 18 U.S.C. § 657, which forbids the willful misapplication of bank funds. *United States v. Bailey*, 859 F.2d 1265, 1278–82 (7th Cir.1988); *United States v. Olson*, 825 F.2d 121, 123 (7th Cir.1987); *United States v. Bruun*, 809 F.2d 397, 408 (7th Cir.1987); *United States v. Angelos*, 763 F.2d 859, 862 (7th Cir.1985). The defendants were convicted under both statutes, as well as for mail fraud.

■ But we have ignored an important background fact. Long before American Heritage got into financial trouble, its officers were paid their bonuses—with the full knowledge and acquiescence of the pertinent state and federal banking authorities—from the Landfinder's account rather than from bank funds directly. Landfinder's was in a higher tax bracket than the bank, so that, treating the bank and its subsidiaries as a single enterprise (which realistically they were, since the subsidiaries were wholly owned), the after-tax costs of the bonuses were minimized by having Landfinder's pay them and deduct the expense from its income. It is not bank fraud to pay a bank's officers salaries and bonuses, even though the ultimate source of these moneys is—of course—the bank's funds; and for the reason just given there was nothing fraudulent in the fact that in this case the bonuses were paid by an affiliated corporation rather than by the bank itself. It is true that during the period of the bank's decline, the bank stopped paying the bonuses from Landfinder's American Heritage bank account but instead opened an account for Landfinder's in another bank and paid the bonuses from that account. This is not necessarily fraudulent, however, in view of the defendants' testimony, contradicted by no other evidence, that this was done because employees of the bank resented the fact that the officers were drawing off large bonuses at

a time when the bank was in financial trouble. Greed is not fraud.

■ What the government is left with is possible skepticism concerning the defendants' stated reason for taking the unusual step of opening a bank account for one of the bank's wholly owned subsidiaries in another and unrelated bank, plus understandable concern with the exorbitance of the defendants' bonuses in this period of decline, plus the color lent to the bonus arrangement by the abundant other evidence of fraud. We cannot say that no rational jury, confronted with this tapestry, could find Best and Bewick guilty beyond a reasonable doubt of defrauding the bank by paying themselves huge bonuses from Landfinder's new bank account.

■ Although Conarty had done some modest legal work for the bank while in private practice, he had no substantial involvement in the bank's affairs until he became its in-house counsel at the beginning of 1983. Six weeks later the Kings Point loan closed, the only transaction on which the charges against Conarty are founded. The loan was to be made to a partnership, but two of the three partners—Henning and Pernice—were ineligible to borrow from the bank, because they had reached their loan limit. Henning in addition was in bankruptcy; this much, at least, Conarty certainly knew, because he was one of Henning's creditors and had filed a claim in the bankruptcy proceeding. The third partner was Andreuccetti, and he too was uncreditworthy although there is no evidence that Conarty knew this. In a meeting of bank officers at which Conarty was present, held before the closing, someone remarked that the loan would have to be made to Andreuccetti, because the other two partners were ineligible. So far as appears, Conarty said nothing at the meeting; nor is it known whether he heard the remark about the ineligibility of the other partners. At the closing, which Conarty handled for the bank, the checks for the part of the loan not earmarked for the down payment on the Kings Point property were made out to Henning and Pernice rather than to Andreuccetti. Henning then

"cut" checks to Conarty that paid Henning's full indebtedness to him, thereby giving him a preference (as Conarty well knew) over Henning's other creditors, while Pernice also cut a check to Conarty to pay off a pre-existing debt for legal services.

The circumstances in which Conarty received payment for pre-existing debts from the loan nominally to Andreuccetti permit, although they do not compel, the government's characterization of the receipt as a kickback from a borrower to a bank officer—a clear violation of sections 657 and 1006. The loan was to enable the partnership of Henning, Pernice, and Andreuccetti to purchase and develop real estate owned by the bank, yet the proceeds were going to two of the partners to enable them to pay off pre-existing debts unrelated to the real estate project. This was a misuse of bank funds, and the jury was entitled to find that Conarty, a lawyer and bank officer, knew it. Nor was this all. At the same closing, Pernice cut a check to Best to pay a debt he owed him. The inference that Best and Conarty were being compensated for making a loan to uncreditworthy borrowers is hard to resist. The inference is strengthened by the fact that, since Henning was in bankruptcy, he was under no legal obligation to pay the face amount of his debt to Conarty; quite the contrary. The payment was not the discharge of an obligation, but—a rational jury could have found—compensation for Conarty's cooperation in the making of the bank loan to (in effect) Henning. The payment was over and above Conarty's compensation for handling the loan, was substantial (a total of $13,000), and distinguishes his case from that of a secretary who types documents that may appear fishy, but who receives no additional compensation for doing so.

Although there was enough evidence to convict all three defendants of fraud, fraud was only one possible characterization of their conduct. Another was that they were honestly, though carelessly and indeed incompetently, trying to save the sinking bank, and compensating themselves no more than commensurately with their hero-

ic if futile efforts. Obligated as we are, in evaluating the defendants' claim that they were entitled to be acquitted, to construe the evidence as favorably to the government as the record permits, we have presented a persuasive narrative of bank fraud. But the jury could, without taking leave of its senses, have construed the evidence more benignly. Because it was a close case the alleged trial errors take on greater importance than they would otherwise. We find only one error; but it is a beaut.

■ At the beginning of this protracted trial, the government with the judge's permission furnished each juror with a looseleaf binder containing the key government exhibits arranged by transaction, to assist the jury in following the evidence. Because the exhibits in the binders had not yet been placed in evidence, the judge told the jurors not to look in the binders until a particular exhibit was admitted into evidence, and then to look only at that exhibit in the binder. He also told them to leave the binders in the jury box during recesses. When the trial ended and the jury left the box, the binders were still there, lying on the floor beside each juror's seat; several spare binders were also lying on the floor. The original exhibits themselves were in ten boxes, nine containing the government's exhibits and one the defendant's. According to affidavits submitted by defense counsel, the prosecutor (Susan Bogart) and the various defense counsel had a brief discussion about which exhibits would go to the jury room and it was agreed that only the boxes of exhibits (and some charts summarizing evidence) would go. The defense counsel then left the courtroom and the judge turned to his motion call. An FBI agent assisting in the prosecution, in the presence of the prosecutor, then loaded the exhibits from the first-row spectators' bench on which they had been lying—and the binders—onto a cart that the marshal then wheeled into the jury room. The prosecutor denies having told defense counsel that the binders would not be going to the jury room, but she did not make this denial in an affidavit under oath, as the defense

counsel had done. According to the FBI agent's affidavit (unsworn), the prosecutor did not just stand there but actually helped him load the binders onto the cart.

When first asked by the judge how the binders had found their way into the jury room, the prosecutor said that they had been stacked on the bench with the other exhibits, implying that the defense counsel should have objected if they did not want the binders to go to the jury with the other materials on the bench (i.e., the exhibits). But the prosecutor's statement was contradicted by her own later affidavit—also inexplicably unsworn—as well as by the FBI agent's affidavit. It is almost certain that the binders were on the floor of the jury box, where they had been throughout the trial except when the jurors were actually looking at them, when defense counsel left the courtroom and the FBI agent and the prosecutor began loading the cart with materials for the jury room.

A chance remark by the marshal to one of the defense counsel to the effect that the jury room was getting messy with all the exhibits *and books* lying around revealed, after the jury had been deliberating for four days, that the binders were in the jury room. The defense immediately protested to the judge, who waited until the jury had gone home for the weekend and then ordered the binders withdrawn from the jury room. The jury was not told about this, and when it arrived in the jury room on Monday morning the jurors noticed the binders' absence. The foreman went to the judge's chambers and told the judge's secretaries that the binders had disappeared and that he was afraid someone had broken into the jury room and stolen them. He was given no explanation for the disappearance of the binders.

The jury resumed its deliberations, and four hours later brought in its verdict. Afterward the judge summoned the jury to his chambers and in the presence of the lawyers questioned the jurors about the use they had made of the binders. The jurors acknowledged having used them in their deliberations but in response to a question by the judge denied having used

them to the exclusion of the original exhibits. The judge then denied the defendants' motion for a mistrial, emphasizing not only that the jury had consulted the original exhibits as well as the government binders but also that all the exhibits in those binders were in evidence.

The judge's reaction when the presence of the binders in the jury room was discovered, coupled with the prosecutor's failure to submit a proper affidavit denying the allegations in the affidavits of the defense counsel, persuades us that in all likelihood the prosecutor dispatched the binders to the jury knowing that they were not supposed to go there. If this is indeed what happened, it was serious misconduct on her part—to which we are alerting both the Public Integrity Section of the Department of Justice and the Executive Committee of the United States District Court for the Northern District of Illinois—but, since with immaterial exceptions we do not reverse for harmless error, Fed.R.Crim.P. 52(a), it warrants a new trial only if there was a "reasonable possibility" that the presence of the unauthorized materials affected the jury's verdict. *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir.1982) (en banc); *United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir.1989); *United States v. Barnes*, 747 F.2d 246, 250–51 (4th Cir.1984). The government argues that there was not, because every exhibit in the binders was in evidence and therefore merely duplicated an exhibit in one of the ten boxes of exhibits that were also in the jury room. We disagree with the argument although mindful that in most cases in which unauthorized materials find their way into the jury room the materials had not even been admitted into evidence, as they were here, and that we review the trial judge's decision whether to set aside a verdict because of unauthorized materials in the jury room under the deferential "abuse of discretion" standard of appellate review. *United States v. Bruscino, supra; United States v. Andrews*, 895 F.2d 406, 408 (7th Cir.1990); *United States v. Pinelli*, 890 F.2d 1461, 1473 (10th Cir.1989).

The hundreds of documents in the ten boxes of original exhibits were arranged by

transaction to some extent, but there were many more documents in each file of these exhibits than there were in the corresponding section of the government's binder, yet the section invariably contained all the *essential* documents and the file sometimes did not. For example, the section of the binder that was devoted to the Kings Point loan contained the checks to Best and Conarty, but the file on that loan in the exhibit boxes did not. The binders thus presented the evidence favorable to the government in a compact and also a convenient form. There was only one set of the original exhibits (the ten boxes' worth), which the twelve jurors thus had to share. But there were sixteen or seventeen binders— one for each juror, with some left over— each containing a relative handful of the government's exhibits. And those exhibits were sorted to make the theory of its case stand forth plainly. Thus, under Kings Point again, the key documents pointing to the defendants' guilt were arranged chronologically, so that, for example, Andreuccetti's unimpressive financial statement, demonstrating his lack of creditworthiness, was followed by the checks cut to Conarty. This juxtaposition was suggestive—indeed tendentious—since there was no evidence that Conarty had ever seen Andreuccetti's financial statement; Conarty was not a member of the loan committee, which had received the loan application with its supporting documents and had approved the loan.

There were, moreover, no defense exhibits in the binders. If the jurors wanted to look at defense exhibits they had to go to the box containing them: one box, for twelve jurors.

There is nothing in the least improper about a party's placing its key exhibits, or for that matter all its exhibits, in binders for the jurors to use during their deliberations, as well as during the trial itself. Some judges require the parties to do this in order to make it easier for the jury to read and refer to the exhibits. Far from being questionable, the practice is commendable. But it is improper for one party to do it when the other party has been led to understand that the binders will be used only to enable the jurors to look at a specific exhibit when it is introduced in evidence, and not to take with them to the jury room when they are deliberating. If defense counsel had known what use the jury would be permitted to make of the government's binders, it might have supplied its own binders to the jury, containing its own exhibits or its own ordering of both sides' exhibits; or it might have objected to the tendentious selection and arrangement of exhibits in the government's binders. Because of the prosecutor's carelessness or, quite possibly, her deceit, defense counsel were deprived of this opportunity.

The fact that all the exhibits in the binders were in evidence and therefore accessible, in principle anyway, to the jurors cannot be decisive. There is a difference between theoretical access and practical access. The fact that some piece of personal information about someone is lurking somewhere in the government's vast archives and data bases is not to be deemed a surrender of the person's right of privacy. *U.S. Dept. of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 1476–80, 103 L.Ed.2d 774 (1989); *Thomas v. United States*, 890 F.2d 18, 21 (7th Cir.1989). The situation here is less dramatic, as the ten boxes of exhibits were clearly labeled and each exhibit was in a clearly labeled manila folder; there was not a complete jumble. Nevertheless the exhibit books supplied by the government were immensely more convenient, and were in fact heavily used by the jurors. The very fact that the defense supplied no exhibit books of their own was calculated to give the government's books a certain authority in the minds of the jurors and to validate the suggestive order in which the exhibits were marshaled in the books. The jury did not know, moreover, that the defense counsel were unaware that the government's binders were going to be sent into the jury room; the absence of defense binders might therefore have struck the jury as an admission that the government's binders contained all the relevant evidence, suitably ordered.

The furnishing of these binders to the jurors was, in the circumstances, a form of jury tampering—a subtle form, but perhaps not less effective because of its subtlety. The case is within the orbit of the decisions that find reversible error when documents summarizing the government's case find their way into the jury room. *United States v. Ware,* 247 F.2d 698, 700–01 (7th Cir.1957); *Sanchez v. United States,* 293 F.2d 260, 267–69 (8th Cir.1961); *United States v. Adams,* 385 F.2d 548 (2d Cir.1967); *United States v. Brown,* 451 F.2d 1231, 1234 (5th Cir.1971); *United States v. Pendas–Martinez,* 845 F.2d 938, 941 (11th Cir.1988). Dictum in *United States v. Schuster,* 777 F.2d 264, 269–70 (5th Cir.1985), discussing a factual situation much like the one in this case, provides further support for our conclusion, while *United States v. Davies,* 768 F.2d 893, 905 (7th Cir.1985), illustrates a case on the other side of the line that we are trying to draw between the clearly harmless, and the potentially harmful, introduction by the government of unauthorized materials into the jury room.

If the able and experienced trial judge, on the basis of close observation of the jury during the seven-week trial, and a feel for the evidence that an appellate panel cannot duplicate, had furnished grounds for doubting that the government binders were likely to have affected the jury's deliberations, we would give great weight to his refusal to grant a mistrial. But he did not. The fact that the jury did not use the binders to the exclusion of the original exhibits has little significance, for this is ordinarily the case when unauthorized materials seep somehow into the jury room—the jury doesn't look *just* at those materials. The fact that everything in the binders was in evidence is pertinent, but neither by itself nor in conjunction with the previous point can it be regarded as decisive on the issue of interference with the jury's deliberations.

This was a close case, and the government's misconduct may well have made a difference in the outcome, at least with regard to defendant Conarty, and to some of the counts against the other defendants as well. Compare *United States v. Wright–Barker,* 784 F.2d 161, 173–74 (3d Cir.1986); *United States v. Warner,* 428 F.2d 730, 738 (8th Cir.1970). The judgments must therefore be reversed, although the government can if it wishes retry the defendants. *Oregon v. Kennedy,* 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982).

The defendants raise a number of other issues, but they have no merit and require no discussion, except to note that the defendants' argument from *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), is answered by our opinions in *United States v. Bailey, supra,* 859 F.2d at 1275–78, and *United States v. Cosentino,* 869 F.2d 301, 307 (7th Cir.1989).

REVERSED AND REMANDED.