**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John C. BEST, Gregory J. Bewick and Paul F. Conarty,**
**Defendants–Appellants.**

**Nos. 87–2456, 87–2457 and 87–2458.**

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1990.

Reargued En Banc June 11, 1991.

Decided Aug. 5, 1991.

Anton R. Valukas, U.S. Atty., Jeanne M. Witherspoon, Asst. U.S. Atty., Office of U.S. Atty., Crim. Div., David J. Stetler, Victoria J. Peters, Asst. U.S. Attys., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

James R. Ferguson, Sonnenschein, Nath & Rosenthal, James S. Montana, Jr., Susan G. Feibus, Sidney Z. Karasik, Lydon & Griffin, George P. Lynch, and Gregory C. Jones, Irving C. Faber, Grippo & Elden, M. Jacqueline Walther (argued), Kielian & Walther, Mary Ellen Dienes (argued), Chicago, Ill., for defendants-appellants.

James R. Ferguson, Sonnenschein, Nath & Rosenthal, Gregory C. Jones, Irving C. Faber, Grippo & Elden, Chicago, Ill., Dennis A. Rendleman, Ill. State Bar Ass'n, Staff Counsel, Springfield, Ill., for amicus curiae Susan Bogart.

Before BAUER, Chief Judge, CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

BAUER, Chief Judge.

In this *en banc* review, we must decide whether the defendants were deprived of a fair trial due to the presence of binders

containing certain government exhibits in the jury room during deliberations. In our prior opinion, *see United States v. Best*, 913 F.2d 1179 (7th Cir.1990), *vacated*, 924 F.2d 646 (7th Cir.1991), a panel of this court held that the presence of the binders during jury deliberations was jury tampering that constituted reversible error. After rehearing the case *en banc*, we now hold that the presence of the binders in the jury room was not error, and, therefore, affirm the defendants' convictions.

## I.

Having recited the complex facts of this case in the earlier opinion, we need only glean from that recitation here. *See Best*, 913 F.2d at 1181. John C. Best, Gregory J. Bewick, and Paul F. Conarty were indicted on thirty-five counts of mail fraud, misapplication of bank funds, bank fraud, and related crimes committed in the course of the failure of the American Heritage Savings and Loan Association ("American"), a federally insured institution of which Best, Bewick, and Conarty were officers. Best was its president and chaired its Board of Directors, Bewick its executive vice-president and managing officer, and Conarty its in-house counsel.

American had been experiencing financial difficulties since 1981, when the State of Illinois Commissioner of Savings and Loans and the Federal Home Loan Bank Board conducted a joint examination of its economic condition and projected a net loss in excess of $1.7 million and net worth deficiency of approximately $200,000 by the end of the fiscal year. Between late 1981 and mid–1983, Best and Bewick, joined later by Conarty, embarked on a course of desperate efforts to keep American afloat. It was those actions that eventually led to the insolvency of the association and gave rise to this prosecution.

By 1981, American and its subsidiaries, American Heritage Service Corporation ("Service"), Metrodyne, Incorporated ("Metrodyne"), and Landfinder's Realty Corporation ("Landfinder's"), had accumulated large holdings in real estate, primarily through foreclosure, known as "real estate owned" or "REO." Best wanted to get the REO off American's books because it was a non-earning asset and a drain on American's earning power. In addition to several other practices that violated the norms of the savings and loan industry, Best and Bewick would require borrowers to purchase REO from American and its subsidiaries as a condition of obtaining a loan. *See Id.*, 913 F.2d at 1181. In so doing, Best and Bewick attempted to disguise the American's deteriorating financial status. They would apply as much of the loan as was necessary to cover the down payment for the purchase of the real estate. By this tactic, Best and Bewick, in effect, were selling American's real estate to the borrower—who typically was not creditworthy and known by Best and Bewick to be so—for no cash down. Moreover, they were selling this real estate at inflated prices, based on inflated appraisals, so that American could book a profit on the sales and thereby improve its balance sheet even though it was extremely unlikely that the borrower would be able to complete the payments for the property or that, when the borrower stopped making payments, the property could be sold for a price equal to the purchase price—or for that matter, equal to the loan. *Id.* While engaging in these reckless transactions, which predictably flopped, and while the bank was losing money hand over fist, Best and Bewick paid themselves large bonuses from the Landfinder's account. *Id.*

Conarty became involved when he joined American as its in-house counsel in early 1983. During that year, American made sizeable loans to a partnership, but two of the three partners were ineligible to borrow from the association because they had reached their loan limit. Conarty at least knew that one of the partners was in bankruptcy because he was one of that partner's creditors and had filed a claim in the bankruptcy proceeding. *Id.* The loan was made to enable the partnership to purchase and develop real estate owned by American, yet the proceeds of the loan were going to two of the partners to enable them to pay off pre-existing debts unrelated to the real estate project. This loan, there-

fore, constituted a misuse of bank funds of which Conarty was aware and in which he participated.

As American's financial condition deteriorated, the Federal Home Loan Bank Board ("FHLBB"), which promulgates and enforces the rules and regulations that govern federally insured savings and loan associations, more carefully scrutinized American's lending practices. Between 1981 and 1983, Best and Bewick were able to keep the examiners at bay, in part by concealing the ultimate recipients of loan proceeds. Best's and Bewick's maneuvers to continue to manipulate the net worth of American allowed it to continue to operate approximately one year beyond the point of insolvency. It was only after an extensive review of the loan files and the other records of the association that the examiners were able to determine the true recipients of the loan proceeds. The FHLBB took control of American in 1984—an event that would have occurred much sooner if the true financial condition of American had not been concealed by Best and Bewick.

A jury trial commenced on April 20, 1987, in the United States District Court before the Honorable Nicholas Bua. After a seven-week trial, the jury found Best and Bewick guilty of all counts save one. The jury found Conarty guilty of six counts, including mail fraud, misapplication of savings and loan funds, and participation by a savings and loan officer in an improper loan. Four months later, Judge Bua sentenced Best to one year and a day in prison, three years probation, and five hundred hours of community service; Bewick to six months work release, three years probation, and five hundred hours of community service; and Conarty to three years probation and four hundred hours of community service.

All three defendants appealed. A panel of this court reversed the defendants' convictions and remanded the cause to the district court. We vacated that opinion and granted the government's petition for rehearing *en banc* to reconsider whether the jury's use of the government's binders during deliberations constitutes reversible error.

## II.

Near the beginning of the trial, the government furnished each juror with a loose-leaf binder containing the key government exhibits arranged by transaction. The district court understood that the binders would be used to help the jury follow the descriptions of the various exhibits. *See* Transcript of Trial Proceedings ("Trial Trans.") at 677. Yet, because the exhibits in the binders had not yet been placed in evidence, the judge told the jurors not to look in the binders until a particular exhibit was admitted into evidence, and then to look only at that exhibit in the binder. He also told them to leave the binders in the jury box during recesses. *See Id.* at 678, 730. The binders remained in the jury box with the jurors throughout the trial. None of the defendants objected to this use of the binders by the jury. *See Id.* at 678.

When the trial ended, the binders were left by the jurors in the jury box. The district judge instructed the parties to review the exhibits and to agree on which exhibits were to be sent to the jury for deliberations. The various defense counsel and the prosecutors spent the morning of June 9, 1987, reviewing the many exhibits that the parties intended to send into the jury room. There were ten boxes of exhibits—nine boxes of government exhibits and one box of defense exhibits—lined up on the front row spectator bench in the courtroom. Defense counsel claim that the prosecutor promised them that the binders were not going to be sent to the jury room. The prosecutor denies ever making such a promise. *See* Affidavit of Prosecutor at 7. After resolving some minor issues regarding one or two of the exhibits, the judge directed that the exhibits entering the jury room be placed in the custody of the United States Marshal. Defense counsel then left the courtroom and the judge turned to other business. The prosecutor and the case agent from the FBI began loading all the exhibits, including the binders, onto a cart

that the marshal wheeled into the jury room.

After the jury had been deliberating for four days, one of the defense counsel learned that the binders had been sent into the jury room and moved for a mistrial. *See* Trial Trans. at 5986. Defense counsel argued that the submission of the binders to the jury during deliberations constituted reversible error. The binders were, counsel argued, merely roadmaps to conviction, highlighting the key exhibits of the government's case. Moreover, these binders were sent to the jury room with neither the knowledge nor consent of the defendants. The district court denied the motion. *See* Trial Trans. at 5990, 5999, 6029. However, because the government agreed to defense counsel's request to have the binders removed, the binders were removed from the jury room after the jurors were dismissed for the weekend. *See* Trial Trans. at 5997–98, 6007.[1]

On the following Monday, the jurors finished deliberating and returned the verdicts described above. There is no doubt that the jurors noticed the absence of the binders: on Monday morning, the foreperson asked about the missing binders and requested the return of various slips of paper upon which jurors made notes and which were placed inside the binders. The district court chose not to respond to the jurors' request, and approximately four hours later, the jury came in with its verdicts. Following the verdicts, the district court agreed to conduct an examination of each juror to determine whether he had used the binders to the exclusion of all the original exhibits admitted in evidence. Each juror stated that he used the binders only in conjunction with the original exhibits during the deliberations. Every juror remarked that they had examined the other exhibits in the jury room. *See* Trial Trans. at 6195–6215.

Regardless of the jurors' statements about considering all the evidence, the defendants filed a joint post-trial motion for a new trial based on the prejudicial impact of the binders on jury deliberations and the alleged misconduct by the government. Defense counsel argued that they had been misled by the prosecution regarding what was to be sent to the jury room and that the presence of the binders in the jury room had contaminated the jurors' deliberations. Prior to sentencing the defendants, the district court heard argument from the parties on the post-trial motion. At that time, both parties were prepared to give sworn testimony regarding the defendants' allegations. But they didn't get the

---

1. The panel seemed to attach significance to the district court's decision to remove the binders from the jury room once the defendants raised their objections. *See Best,* 913 F.2d at 1183. We find that significance unwarranted. The transcript of the district court proceedings plainly reveals that the court had the binders removed not becuase it found their presence in error, but because the parties stipulated to their removal:

> Defense Counsel: Judge, ... we are going to also move that at the recess, whenever we break and the jury is excused for the weekend, that those jury books [i.e. the binders] be collected, taken out of the jury room, and that the jury not be permitted to look at those jury books for the remainder of their deliberation, because they have the exhibits and they can look at the exhibits....
> The Court: Any objection to that?
> Prosecutor: I have no objection to that.
> The Court: Fine. Okay. * * * So stipulated. Okay, we'll sneak in there after they [i.e. the jurors] leave without letting them know. * * * Let the record show that pursuant to agreement of counsel, without waiving any

defendant's rights to a claim of error because of the jury books going back with the evidence, the court has ordered the court room deputy to remove those twelve jury books from the jury room....

Trial Trans. at 5997–98, 6007.

Later, when ruling on the defendants' post-trial motions, the district court made clear that the removal of the binders did not constitute a finding of error, or, for that matter, any other finding. It was simply a stipulated compromise that was struck between the parties:

> Defense Counsel: [I]t wasn't until Friday afternoon, late in the afternoon, that we discovered that those jury books went back there. And when we made our record, your Honor ruled that the jury books should come out. And what was the first thing—
> The Court: I think that was a compromise position after we discussed it.... * * * But rather than a ruling, I think it was a compromise position. The government had no objection to removing them at that time. But at any rate ... the transcript will reflect that.

Trial Trans. at 6150.

chance: the district court declined to hold a hearing on the issue of government misconduct, finding that the issue was mooted by the fact that all the exhibits contained in the binders had been admitted properly in evidence during the trial, and thus, no harm was done by their presence in the jury room. *See* Trial Trans. at 6272. The district court specifically added that it was *not* finding that the government intentionally deposited the binders in the jury room to prejudice the defendants. *See* Trial Trans. at 6188–89. The district court accordingly denied the defendants' motion for a new trial and proceeded with sentencing.

### III.

■ On appeal, the defendants renew their arguments that the prosecutor's misconduct in sending the binders into the jury room prejudiced the defendants and, thereby, deprived them of a fair trial. We need only reach the misconduct issue, however, if the defendants establish that there was some prejudice or substantial right affected by the presence of the binders in the jury room during deliberations, and that the district court abused its discretion by refusing to hold an evidentiary hearing on that alleged misconduct. *See United States v. Wilson,* 715 F.2d 1164, 1169 (7th Cir.), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983). Thus, first—and, as we shall see, the only—issue we face is whether the district court acted reasonably in refusing to set aside the verdict because it found no possible prejudice. *See United States v. Bruscino,* 687 F.2d 938, 940 (7th Cir.1982) ("The proper standard of appellate review ... is whether the district court abused its discretion in denying defendant's motion for a new trial.") (quotations omitted). We note that, under the abuse of discretion standard, the proper inquiry "is not how the reviewing court would have ruled if it had been considering the case in the first place, but rather whether any reasonable person could agree with the district court." *Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1201 (7th Cir.1989) (quoting *United States v. $103,387.27 in U.S. Currency,* 863 F.2d 555, 561 (7th Cir.1988)).

In *Bruscino,* we faced a similar question. In that case, the two defendants, inmates at a federal penitentiary, were charged with the murder of another inmate. The defendants argued that their convictions were unlawful because the jury had been exposed to two documents not in evidence—specifically, a Bureau of Prisons report and a newspaper article. The report suggested that one of the defendants was involved with the "Mexican Mafia," and the article related that all of the individuals who had been indicted for the murder had pleaded guilty, except the two defendants. We held that the district court did not abuse its discretion in concluding that it was highly unlikely that the jury had been prejudiced by the documents in question. Therefore, we affirmed the convictions. Given the wealth of admitted evidence against the two defendants, we found the challenged documents "drably descriptive," telling the jury "nothing it did not already know," and thus insufficient to justify reversing the convictions. *See Bruscino,* 687 F.2d at 942.

The instant case presents an even stronger argument for affirming the convictions of Best, Bewick, and Conarty. In *Bruscino,* the challenged documents were not admitted in evidence; therefore, it was error for the jury to see such documents. *See Id.* at 940 ("A criminal defendant in our system has a right to be tried on the basis of the evidence admitted at his trial, and this right may be violated if the jury gets access to extra-record evidence...."). Thus, the question in *Bruscino* was whether the district court abused its discretion in concluding that that error had not prejudiced the jury. But in the present appeal, all parties agree that the jury properly could review the exhibits contained in the binders—after all, they openly had been examining those binders, document by document, in the course of the seven-week trial, and by the end of the trial, every document in the binder had been admitted in evidence. Thus, it simply could not have been error for the jury to see the exhibits contained in the binders.

The only contention of prejudice is that the use of the binders during deliberations made it easier for the jurors to follow the government's case, and that the jurors might have taken the absence of any binders provided by the defendants as an indication that the defense agreed that the government's binders contained all the relevant evidence. *See Best,* 913 F.2d at 1184. This argument ignores the fact that the binders contained only copies of documents admitted in evidence; the original exhibits, both the government and the defense documents, were carefully organized in boxes that were just as easily accessible to the jury. The binders were no more "roadmaps to conviction" than were the ten boxes of carefully ordered evidence.

Even if we accept the argument that the binders permitted greater access to the government exhibits, we nevertheless fail to see how easy access by itself amounts to error. If the defendants objected to the ease of access which the binders provided, the time to object was when the binders were first distributed to the jury in the opening days of the trial. Not only did they fail to object, but the record reveals that during the trial the defendants themselves frequently directed the jury's attention to the binders in order to focus the jurors on a particular document or transaction. As the district court appropriately ruled, once it was determined that the documents in the binders properly were admitted in evidence, and considering the fact that the binders had been on the jurors' laps for seven weeks, there can be no issue of prejudice:

> The Court: Well, I think, here again, it would be a serious issue, obviously, and I would declare a mistrial at the snap of a finger in the event the jury did not have that jury book [i.e. binder] on their laps for almost two months, and, also, if, indeed, the exhibits appearing in the jury book were not exhibits actually received in evidence. I'd have no problem with it. I don't think it is a proper reaction for the court to declare a mistrial just be-

cause this evidence has been compiled in one jury book.

Trial Trans. at 6038–39.

The cases upon which the defendants and the panel's opinion rely easily are distinguishable. In each of these cases involving the jury's exposure to "unauthorized" materials during deliberations, the materials in question were not properly admitted in evidence. Indeed, the three main cases cited by the defendants, *United States v. Brown,* 451 F.2d 1231 (5th Cir.1971); *Sanchez v. United States,* 293 F.2d 260 (8th Cir.1961); and *United States v. Ware,* 247 F.2d 698 (7th Cir.1957), all involved situations in which federal agents in narcotics cases had handwritten on the envelopes that contained the narcotics the time, date, and place of the defendant's sale of the drugs, as well as the results of the laboratory analysis including the drugs' purity and amount. The courts in those case, observing that the notes were profoundly detailed, concluded that the labels on the envelopes amounted to a "neat condensation" of the government's case on each sale. *Brown,* 451 F.2d at 1234; *Sanchez,* 293 F.2d at 269; *Ware,* 247 F.2d at 700. The important distinction here is that, unlike the documents in the binders in the present case, the labels in *Brown, Ware,* and *Sanchez* had not been admitted properly in evidence.

Even in more recent cases in which we have held that unauthorized materials in the jury room did *not* require a mistrial, we still focused on whether the materials in issue had been admitted in evidence. *See United States v. Herrero,* 893 F.2d 1512, 1539–41 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990) (presence of map in the jury room not in evidence did not require mistrial); *United States v. Sababu,* 891 F.2d 1308, 1332–34 (7th Cir.1989) (presence of transcript from telephone conversation previously excluded from evidence in the jury room did not violate defendant's constitutional rights); *United States v. Key,* 859 F.2d 1257, 1264 (7th Cir.1988) (debtor not entitled to new trial because there was no reasonable probability that evidence that debtor's husband had been convicted of tax evasion, which

one juror learned from an outside source and communicated the information to another juror, had affected the jury's verdict); *United States v. Weisman,* 736 F.2d 421, 424 (7th Cir.), (one juror's bringing into the jury room a newspaper clipping that referred to the co-defendant's guilty plea was harmless and did not warrant new trial) *cert. denied,* 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984). If exposure to such improper evidence did not warrant a new trial in these cases, the jury's exposure in this case to copies of documents *properly admitted in evidence* in a binder that the jury had used for the length of the trial cannot warrant a new trial.

Moreover, the district court did not simply rely on the fact that the documents had been admitted in evidence. The court also verified, through individual voir dire of each juror, that the jurors considered all the evidence, not just the binders, in arriving at their verdicts. *See* Trial Trans. at 6275–76. Given this support, the district court's denial of the defendants' motion for mistrial was not an abuse of discretion. As we declared in *Bruscino:*

> The trial judge will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he has presided.... As we cannot put ourselves in the district

judge's shoes in these matters we ought to accept his judgment unless we have a very strong conviction of error.

687 F.2d at 941. Here, the district court found no error resulting from the presence of the binders in the jury room during the deliberations. The record competently supports such a finding.[2]

Because we determine that the district court did not abuse its discretion, we need not even address the defendants' charges of prosecutorial misconduct. Simply put, if there was no error in the jurors' use of the binders during deliberations, then *how* the jurors came to have the binders in the jury room is immaterial. The district court felt similarly, as it refused to hold an evidentiary hearing regarding possible government misconduct: "There is no need for any additional hearing. I think it is mooted out. The only concern this court had was the jury might have had with them during their deliberations exhibits which were not admitted in evidence." Trial Trans. at 6272.

Thus, although the record contains the conflicting affidavits of the prosecutor and the defense counsel, the district court declined to resolve these disputes. With no record to guide us, we refuse to "find facts" on appeal.[3] *See United States v.*

---

**2.** The dissent maintains the position that the presence of the binders in the jury room constituted *error*—that they were "unauthorized materials." But the materials *were* authorized—were in fact in the possession of and perused by the jurors for nearly seven weeks. The agreement or acquiescence in their use by the defendants is simply not material to the issue of whether they were admissible pieces of evidence—and each piece of the material in the binders *was* in evidence.

The dissent also suggests that the immediate agreement of the government to withdraw the binders is somehow an admission that they were wrongfully there. Not so. It is simply an acknowledgement that it didn't make the slightest difference. With or without the binders, the exhibits were in the jury room. So rather than fight over the program, take the binders out. (It is interesting that when these binders—these "road maps to guilt"—were in the jury room, they deliberated four days without result; four hours after their removal, the jurors found their own road map and returned a guilty verdict. Speculation on jury process is a futile pastime at best but since the subject was raised, why not?)

The dissent also complains that the post-trial questioning of the jurors was inadequate because the only thing the court asked was whether they had used the binders "to the exclusion of the original exhibits." This is not so. What the court asked was whether they had used the binders to the *exclusion* of the other *exhibits*—government and defendant. *See* Trial Trans. at 6196. The answer to this question was negative. That was the *only* issue raised by the defense. Any further inquiry would have been an inquiry as to how the jurors arrived at their verdict. That inquiry is clearly improper unless there is an allegation that something *not* admitted in evidence was in the jury room or some improper communication had occurred. *See* Fed.R. Evid. 606(b). *See generally* J. Haddad, J. Zagel, G. Starkman & W. Bauer, *Cases and Comments on Criminal Procedure,* 1461–62 (3d ed. 1987). Neither of these facts were alleged or were true. The court simply put to rest a stated fear of the defense counsel.

**3.** On this question, we note that the findings of the original panel in this case that suggested that Assistant United States Attorney Susan Bo-

*Rodriguez*, 888 F.2d 519, 525 (7th Cir.1989). *See also Mars Steel Corp. v. Continental Bank*, 880 F.2d 928 (7th Cir.1989) (*en banc*). Instead, we hold that the district court's refusal to entertain an evidentiary hearing concerning the defendants' charges of prosecutorial misconduct was not an abuse of discretion. *See Wilson*, 715 F.2d at 1169 (finding no abuse of discretion when the district court denied an evidentiary hearing on the defendants' claim that the government leaked information to the press, which resulted in prejudicial pretrial publicity, where there was no evidence that the pretrial publicity adversely affected the rights of the defendants.). As the panel rejected the defendants' other contentions, we do so as well, relying on the panel's brief discussion. *See Best*, 913 F.2d at 1180–82, 1185.

## IV.

For the reasons discussed above, the judgments of conviction are

AFFIRMED.

POSNER, Circuit Judge, with whom CUMMINGS, CUDAHY, EASTERBROOK, and RIPPLE, Circuit Judges, join, dissenting.

As a result of the introduction by the prosecutor of unauthorized materials into the jury room, and the trial judge's failure to apply the correct legal standard in determining whether that introduction had prejudiced the jury's deliberations, the three defendants were improperly convicted, and are entitled, as the panel unanimously found, to a new trial. Although there was adequate evidence of the defendants' guilt, it was a close case, and defendant Conarty in particular might well have been acquitted but for the business with the binders.

At the beginning of this seven-week trial of a complicated financial fraud, the government, with the judge's permission, supplied each juror with a loose-leaf binder containing the key government exhibits, arranged by transaction, to assist the jury in following the evidence. Because the exhibits in the binders had not yet been placed in evidence, the judge told the jurors not to look in the binders until a particular exhibit was admitted into evidence, and then to look only at that exhibit. He also told them to leave the binders in the jury box during recesses. When the trial ended and the jury left the box, the binders were still there, lying on the floor beside each juror's seat; several spare binders were also lying on the floor. The original exhibits were in ten boxes, nine containing the government's exhibits and one the defendants'. (The defendants had not supplied the jurors with copies, bound or otherwise, of their exhibits, so the only defendants' exhibits that the jurors had seen or would ever see were the original exhibits.) At this time the defendants' lawyers, according to affidavits they submitted, had a brief discussion with the prosecutor about which exhibits would go to the jury room, and it was agreed that only the ten boxes of original exhibits would go, together with some charts summarizing parts of the evidence— not the government's binders.

The defendants' lawyers then left the courtroom, and the judge turned to his motion call. The prosecutor was still in the courtroom. In her presence an FBI agent who had assisted in the prosecution loaded both the ten boxes of original exhibits, which had been lying on the first-row spectators' bench, *and* the government's binders, onto a cart that the marshal then wheeled into the jury room. The prosecutor denies having told the defendants' lawyers that the binders would not be going to the jury room, but she did not make this denial in an affidavit under oath, as the defendants' lawyers had done with their version of the conversation. According to the FBI agent's "affidavit," which was also unsworn, the prosecutor actually helped him load the binders onto the cart. The district judge made no finding as to who was telling the truth, so for purposes of this appeal we must (even if we disregard

gart, the lead prosecutor in this case, had "quite possibly" engaged in misconduct have been vacated. Had the district court believed an in-

quiry into Ms. Bogart's conduct warranted, it could have conducted one; we should not perform that task in its stead.

the prosecution's unexplained failure to execute proper affidavits) assume that the binders were sent to the jury without the consent or acquiescence of the defendants' lawyers.

A chance remark by the marshal to one of the defense lawyers that the jury room was getting messy with all the exhibits *and books* lying around revealed, after the jury had been deliberating for four days, that the binders were in the jury room. The defense immediately protested to the judge, moved for a mistrial, and demanded that the binders be withdrawn from the jury room as soon as the jury broke for the weekend. The prosecutor made no objection to that demand. The judge waited until the jury had left and then had the binders withdrawn and sealed in a garbage bag together with yellow sheets of paper, which had been inserted in the binders, on which the jurors had made notes.

The jurors had been told nothing about the *contretemps* over the binders, but when they arrived Monday morning to resume their deliberations they immediately noticed that the binders were gone. The jury foreman went to the judge's chambers and told the judge's secretaries that the binders had disappeared and that he was afraid that someone had broken into the jury room and stolen them. He was given no explanation for the disappearance of the binders, or of the jurors' notes that disappeared with them. Those notes, by the way, were *all* the notes the jurors had made during their deliberations to date. For, concerned lest the cleaning staff or other building personnel read the notes, the jurors had adopted the practice of tucking all their notes into the government binders at the end of each day's deliberations.

The jury resumed its deliberations and four hours later brought in its verdict. The judge then summoned the jurors to his chambers one by one and in the presence of the lawyers asked the jurors whether they had used the binders in their deliberations to the exclusion of the original exhibits. Their answers (which were brief, and there were virtually no follow-up questions) indicated, first, that they had indeed used the

binders in their deliberations—and not just as a place for storing notes. One juror said, "the book [i.e., the government binder] was always in front of me." But they had not used them to the exclusion of the original exhibits. One juror said, "we were in and out of all those boxes"; another, "one person would go through the file [in the boxes of original exhibits], and just grab whatever piece of evidence we were trying to look for. The other members of the jury would then look in the jury book if it was listed in the jury book." A third juror said, "after you withdrew the books [i.e., the government binders]"—for the judge had now told the jurors that the binders had been withdrawn at his direction rather than just having mysteriously disappeared—"we went back to the original exhibits." The judge then denied the defendants' motion for a mistrial.

Both the district court and this court make much of the fact that all the exhibits in the government's binders had been admitted into evidence. That cannot be the end of our inquiry. If the prosecutor had entered the jury room during the jurors' deliberations and told the jurors that if they examined the original exhibits in the following sequence it would help them to understand the defendants' guilt, no judge would think that the fact that all the exhibits were in evidence would save the conviction. Instead of visiting the jury room in person the prosecutor sent into it a roadmap to a guilty verdict, in the form of suggestively sequenced selections from nine boxes of government exhibits, for the jurors to use in *their deliberations*. The ordering of familiar materials is a form of creativity recognized in law: you can copyright a compilation of materials that are in the public domain. And you can convict a man by a tendentious compilation of exhibits already in evidence.

The district judge brushed aside this concern after satisfying himself that the jurors had looked at the original exhibits as well as the government binders. Our court now goes him one better by holding that the judge's initial permission to the government to give the exhibit binders to the jury was permission that the jury could use

them in its deliberations. The judge obviously didn't think he had given the broader permission. If he had, he would not have summoned the jurors to his chambers and quizzed them on the use they had made of the binders and of the original exhibits. He did this because it was only through a slip-up that the binders had found their way into the jury room. Why else was the prosecutor so quick to stipulate with the defendants' lawyers for the withdrawal of the binders from the jury room in the midst of the jury's deliberations? That withdrawal made sense only as an effort to rectify an error. Otherwise it would have been a gratuitous interference with the orderly deliberations of the jury. For remember that along with the binders were removed—also without any explanation— all of the jurors' notes. Remember also that the jurors completed their deliberations under the impression that someone might have broken into the jury room and stolen the binders and notes. How could this deformation of the jury's deliberations have made any sense if the binders were *properly* in the jury room?

I said that you can convict a man with a tendentious compilation of evidence. I will illustrate with Conarty. Best and Bewick, Conarty's two codefendants, were, respectively, the top man and the second in command at a savings and loan association. They were charged with approving a number of improper loans, but Conarty, the association's in-house counsel, was charged in connection with only one of these transactions, the Kings Point loan. It was a loan to a partnership, but two of the three partners were ineligible to borrow from the bank. One of them, Henning, was in bankruptcy. This much Conarty undeniably knew because he was one of Henning's creditors and had filed a claim in the bankruptcy proceeding. Another partner, Andreuccetti, also was uncreditworthy, although there is no evidence that Conarty knew this. At the closing, some of the loan moneys were paid directly to Henning, who then cut a check to Conarty that paid off Henning's indebtedness to him in full. Pernice, the third borrowing partner, also used a portion of the loan moneys to pay a preexisting debt to Conarty. Conarty received a total of $13,000 at the closing. The loan was improper, and if Conarty knew this he was guilty of fraud. There was circumstantial evidence—not least the use of a part of the loan to pay off unrelated debts to him—that he did know. But it was a close case. One reason Judge Bua gave for not quizzing the jurors about the binders before the jury completed its deliberations was that the issue would be moot if the jury returned verdicts of not guilty. In his words, "there's a chance, and I see it quite possible, that Mr. Conarty's case could very well go not guilty."

The government binders made it easy for the jury to infer Conarty's guilty knowledge, because they grouped all the documents relevant to the Kings Point transaction under one tab, which the boxes of original exhibits did not do. There were the checks cut to Conarty right alongside the loan documents themselves. In fact the checks were located in the binder directly after Andreucetti's unimpressive financial statement, demonstrating his lack of creditworthiness, even though there was no evidence that Conarty (who was not a member of the savings and loan association's loan committee) had ever seen the statement, or for that matter the loan documents. It was a suggestive juxtaposition.

The utility of the binders as a guide to guilt was enhanced by the fact that there were so many of them—sixteen or seventeen: one for each juror, with several extras. There were of course no defense exhibits in them. If the jurors wanted to look at defense exhibits they had to go to the original exhibits, which contained one box of defense exhibits: one box, for twelve jurors.

There is nothing wrong with a party's placing its key exhibits in binders for the jurors to use during their deliberations, as well as during the trial itself. But of course the other party is entitled to notice that this is going to be done. If the defendants' lawyers had known that the jury would have the government's binders in the jury room, they might have supplied their own binders to the jury, with their own

ordering of exhibits, and they might have objected to the selection and arrangement of the exhibits in the government's binders. They had no opportunity to do these things. The fact that the jury had the government's binders and no binders from the defendants was calculated to enhance the authority of the government's binders in the jurors' eyes and to validate the suggestive order in which the exhibits were arranged in those binders. Note that when questioned by the judge, the jurors referred to the government binders not as a government compilation but simply as "the jury book." So, as a matter of fact, did the judge.

The district court's lack of control over what went to the jury room, the prosecutor's and the FBI agent's failures (unexplained to this day) to attest their affidavits, the prosecutor's opposition to an evidentiary hearing to clear up the issue of responsibility for the binders' having found their way into the jury room, the disrespect shown the jurors by the spiriting away of the binders and especially of all their notes without any explanation—all these are deeply regrettable features of this case, and in fact embarrassments to federal justice. But we cannot reverse the convictions unless there was a "reasonable possibility" that the presence in the jury room of unauthorized materials affected the jury's verdict. *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir.1982) (en banc). That is a judgment to be made in the first instance by the trial judge, who having observed the jury during the trial is in a better position than we to gauge the probable impact of the unauthorized materials on the outcome. Our review of his judgment is therefore deferential, which explains the cases such as *United States v. Weisman*, 736 F.2d 421 (7th Cir.1984), cited in the majority opinion, in which we and other courts of appeals have affirmed refusals by district judges to grant a mistrial on the basis of the introduction of unauthorized materials into the jury room *when the judge had framed the inquiry relevant to his exercise of discretionary judgment in a proper and responsible fashion. Id.* at 426. In this case he did not. He asked the jurors whether they had consulted the original exhibits as well as the binders, and when they said they had he denied the motion for a mistrial. He asked the wrong question. It is the rare case of introducing unauthorized materials into the jury room in which the jury looks *only* at those materials. That cannot be the decisive consideration. Nor the fact that the exhibits in the binders were in evidence (and in fact when the judge denied the mistrial right after interviewing the jurors, there was an open question whether all the exhibits really had been admitted into evidence). The binders —Ariadne's thread through the maze constituted by the ten boxes of original exhibits—were not in evidence.

The rule that precludes inquiry into the reasoning process by which a jury reached its verdict does not preclude inquiry into the prejudicial impact of extraneous information on the jury's deliberations. Fed.R. Evid. 606(b). The judge should have inquired into the effect on the jury's deliberations of the order of exhibits in the government binders—for example, had the jurors assumed that Conarty had seen Andreucetti's financial statement and the other documents for the Kings Point loan? On the basis of such inquiry, plus an evaluation of the strength of the evidence against Conarty and the other defendants, the judge could have made an informed and responsible decision as to whether there was a reasonable possibility that the use of the binders in the jury's deliberations had changed the outcome of the case—and we would be bound by that decision. The judge's perfunctory and loaded inquiry (e.g., "Did you use the jury book to the exclusion of all the other exhibits and evidence you heard in the case?") suggests more than anything else a determination not to have to sit through another seven-week trial.

Ordinarily when a district judge has failed to exercise the discretion that is his the remedy is a remand to enable him to exercise it. That is not feasible here. The jurors are scattered to the winds and can no longer be questioned about the impact of the binders, and the judge has commit-

ted himself to the view that the binders did no harm.  The bell cannot be unrung.  The defendants are entitled to a new trial.