In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1429

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES CONEY,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:19-cr-00144-jdp-1 — **James D. Peterson**, *Chief Judge.*

———————————

ARGUED APRIL 4, 2023 — DECIDED AUGUST 4, 2023

———————————

Before EASTERBROOK, WOOD, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* A jury convicted James Coney on multiple charges of sex-trafficking minors. The jury reached its verdicts after about five hours of deliberation over two days. The evidence presented at Coney's trial included what the district judge described as "the compelling and memorable testimony of the six minor victims." Coney did not deny his involvement with these girls, nor did he deny posting

prostitution advertisements featuring them on Back-page.com. He offered instead the unusual defense that, although the evidence made it look as if he had run a prostitution ring, he actually committed only violent robberies, using the girls to lure men to hotel rooms.

The issue on appeal arose while the jury was deliberating. The parties and court realized that the laptop computer that had been sent back with the jury containing the evidence for the jury to consider had too many files on it. The court ordered the computer removed from the jury deliberation room. While the parties were attempting to sort out what had happened, the jury reported that it had reached a verdict. That verdict was never examined by the court but was destroyed. After a weekend break to figure out what had happened, briefing on the issue, a curative instruction, and more deliberation time, the jury returned its verdict of guilty on all counts.

Coney then moved for a new trial, and the district court carefully considered the inadvertently provided evidence that the defense highlighted as unfairly prejudicial. The court denied the motion for a new trial, finding no reasonable possibility that the evidence affected the jury's verdict. We affirm.

I.  *Factual and Procedural Background*

   A.  *Evidence Presented at Trial*

At Coney's trial, six women testified that when they were minors, Coney posted prostitution advertisements on the website Backpage.com including sexually explicit photographs of them. One of these women testified that Coney helped her post a Backpage listing but that she ultimately refused to let him "take [her] to calls" because Coney would then "tak[e] all of [her] money." The other five women

testified that they did have sex for money on "calls" controlled by Coney. He would receive messages from potential customers, schedule the time and place of "calls," drive the girls to and from the "calls," set the rates, provide the girls with drugs, alcohol, and condoms, and take most or all of the money.

In addition to the victims' testimony, the government presented Backpage.com advertisements, hotel receipts, text messages, Facebook posts from Coney's account, as well as testimony from case agents and witnesses who knew Coney and the victims and corroborated the victims' accounts of Coney's prostitution scheme. One of Coney's Facebook posts presented during trial read "I got at least five hoes cashing me out." One text message sent from Coney to his underage girlfriend and sex-trafficking victim read "all I know is how to get money from hos." Another message from her to Coney read "James u had me selling my [body and] takin [sic] all my money." Yet another message that Coney sent implored his girlfriend to help get another girl to participate, not mentioning robberies and saying: "We got to get [her] to sell [her body]."

One victim testified that she began a romantic relationship with Coney when she was sixteen and he was twenty-eight. The jury heard about the physical and emotional abuse that characterized the relationship and saw photographs of the underage girl's face covered in bruises. She testified that Coney slapped, punched, kicked, and choked her, sometimes because she returned from a "call" without money. She testified that on one occasion, Coney tied her to a chair and punched her until blood gushed from her face. Coney would tell her that "he was going to marry me or kill me, but [there] was no

way I would be able to walk out of this relationship free." The government presented a Facebook message in which Coney said: "On my dead kids, if I see you again, I'll beat the dog s*** out of you." This girl met Coney after her release from a ten-month stay in a mental health treatment facility following her father's death.

Other victims testified to similar experiences meeting Coney. Another also met him shortly after her release from a mental health treatment facility. Another met him shortly after her father had died and she had run away from home. Another met him while she was homeless.

Two victims testified that, in addition to making money from the prostitution scheme, Coney would occasionally schedule a "call" to interrupt it and to rob the client, sometimes forcing him to hand over his debit card and ATM pin. The victims testified that Coney pistol-whipped one man with a fake gun and choked another until he passed out so that Coney could take his money. One of the women testified that Coney robbed a customer once. The other woman testified that Coney robbed customers on a few occasions. Both testified to far more instances of prostitution than robbery.

Coney's trial strategy was unusual, to say the least. He admitted that his relationship with the underage girl involved domestic violence, but he denied that the violence related to prostitution. He also admitted to posting the prostitution advertisements for minors on Backpage.com and scheduling and facilitating "calls." He claimed, however, that he *always* robbed the customers rather than require the girls to engage in sex for money. His defense was that he ran a violent robbery and extortion scheme that merely masqueraded as sex-trafficking, so he was not guilty of the sex-trafficking charges.

B. *Mishandling of Evidence Sent to Jury for Deliberations*

The evidence at Coney's trial included text messages and photographs from data extractions of his Facebook account and cell phone. The cell phone extractions totaled over 5,000 pages, with approximately 2,500 of those pages containing inaccessible videos, audio files, and metadata. The court admitted these full extractions into evidence. In addressing the Facebook data, however, the court said that the "mass exhibits" would not be sent back to the jury in their entirety for deliberations. Only the parts actually shown to the jury during trial were to be provided. That was the plan, at least.

But, as they say, "mistakes were made." The government loaded the exhibits for the jury deliberations onto a laptop computer that was to be connected to a larger display screen in the deliberation room. Instead of providing the jury with only the exhibits actually shown to the jury during trial, however, the entirety of the cell phone extraction and parts of the Facebook extraction that were not meant to be given to the jury for deliberations ended up on the computer given to the jury.[1]

Jury deliberations began at 12:10 PM on a Friday. At 2:53 PM, the jury sent a note asking for the "reference numbers" to find certain messages between Coney and one of the victims that the jury had seen at trial. While looking to provide the page number references, the court and counsel discovered that too many documents had been included on computer given to the jury. The judge immediately ordered the

---

[1] We share the district judge's frustration and dismay with the prosecution's errors that led to this mistake, and with the fact that neither the defense nor the court double checked the exhibits that the jury would see.

computer removed from the deliberation room and sent a note to the jury saying the court would "have a response for you after we review the documents." Before any further communications and with the computer removed from the deliberation room, the jury reported that it had reached a verdict at 4:35 PM.

The judge told the jurors that they would need to reconvene on Monday to "reconsider" their deliberations with "the proper evidence." The court destroyed the first verdict sheet. The parties submitted briefing over the weekend attempting to identify the improperly provided exhibits. The defense also moved for a new trial or a mistrial and requested an evidentiary hearing on prosecutorial misconduct. On Monday morning, the district judge denied those motions and said that if the jury found Coney guilty, the defense could file "a more full-blown motion for a new trial and we will have a hearing on how this happened."

On Monday, the district court provided the jurors with a curative instruction:

> [S]ome of the documents provided to you had not been shown during the trial. As I have instructed you, you must decide the case based only on the evidence that I have deemed to be appropriate for your consideration. We have now provided you with a corrected set of exhibits. I ask you return to your deliberations and take a fresh look at the documentary evidence. You must base your verdict on the testimony presented at trial and the set of exhibits available to you now. You must disregard any

> document that is not included in the set of ex-
> hibits available to you now.

The jury deliberated for about one more hour on that Monday before returning verdicts of guilty on all counts: four counts of sex-trafficking a minor, 18 U.S.C. § 1591(a)(1), (b)(2), & (c), four counts of transporting a minor to engage in criminal sexual activity, 18 U.S.C. § 2423(a), one count of sex-trafficking a minor accomplished by force, fraud, or coercion, 18 U.S.C. § 1591(a)(1), (b)(1), & (c), and one count of attempting to sex-traffic a minor, 18 U.S.C. § 1591(a)(1), (b)(2), (c), & 18 U.S.C. § 1594(a). The district court sentenced Coney to 330 months in prison (27.5 years) on each count to run concurrently, followed by 25 years of supervised release on each count, also to run concurrently.

C. *Motion for New Trial*

The district court later held an evidentiary hearing on whether any prosecutorial misconduct occurred. The court concluded that the improper evidence was given to the jury inadvertently.[2] Chief Judge Peterson carefully reviewed each specific piece of evidence highlighted by the defense as potentially prejudicial among the thousands of pages inadvertently placed on the computer that was given to the jury. The court examined this evidence in "the context of other evidence presented" and walked through each category of evidence that the defense identified as unfairly prejudicial. The court found

---

[2] Our phrase "improper evidence" summarizes a more nuanced situation. Everything sent to the jury on the computer had been formally admitted into evidence, but over objections that the district court overruled on the condition that only matters actually presented to the jury during trial would be made available during deliberations.

no reasonable possibility that the improper material affected the verdict. The court reached this conclusion "in light of the compelling testimony of the six victims, much of which was corroborated by defendant's own words, taken from the phone and social media messages properly provided to the jury."

II. *Analysis*

The parties dispute the proper standard of review. We address that disagreement and then proceed to review the district court's holding.

A. *The Remmer Presumption Does Not Apply*

The defense argues that the district court erred in not presuming that Coney was prejudiced by the evidence that was inadvertently included on the laptop computer for jury deliberations. The Supreme Court held in *Remmer v. United States* that in criminal cases, "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." 347 U.S. 227, 229 (1954). In *Remmer*, the Supreme Court ordered an evidentiary hearing after an unknown person contacted the jury foreman and said he could profit by returning a verdict favorable to the defendant. The *Remmer* presumption of prejudice is not conclusive. *Id.*

The Supreme Court later applied this presumption of prejudice where a bailiff told two jurors that a defendant was guilty and that if the jury did not return a guilty verdict, the Supreme Court would correct their error. *Parker v. Gladden*, 385 U.S. 363, 365 (1966). This court has applied the *Remmer* presumption of prejudice where the child of a juror who was

incarcerated with the defendant told the juror the defendant was guilty, *Hall v. Zenk*, 692 F.3d 793, 795, 804 (7th Cir. 2012), and where a juror found the word "guilty" written in her trial notebook by an unknown person, *United States v. Vasquez-Ruiz*, 502 F.3d 700, 701, 707 (7th Cir. 2007).

We have not applied the presumption of prejudice from *Remmer* in cases where two hundred transcripts that were admitted into evidence but not used at trial were sent to the jury in error, *United States v. Magana*, 118 F.3d 1173, 1181–83 (7th Cir. 1997), or where binders produced by the government highlighting its theory of the case and its best exhibits reached the jury in error, *United States v. Best*, 939 F.2d 425, 427–29 (7th Cir. 1991) (en banc). In Coney's case, we similarly conclude that the *Remmer* presumption of prejudice does not apply. All of the materials that were improperly sent to the jury were admitted into evidence. Nothing outside the record reached the jury, and no person communicated with a juror in an attempt to influence the outcome of the trial. There is also no evidence the jurors actually viewed any of the material the defense claimed was unfairly prejudicial.

B. *Standard of Review*

The district court applied the proper standard in reviewing Coney's motion for a new trial. A "new trial is not automatically required whenever a jury is exposed to material not properly in evidence." *United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir. 1989). The question for the district court was whether there was a "reasonable possibility" that the improper material affected the verdict. *Id.*, quoting *United States v. Bruscino*, 687 F.2d 938, 940 (7th Cir. 1982). This is a fact-intensive inquiry, see *id.*, and the primary responsibility for deciding whether this prejudice occurred lies with the district

judge, who "will always be in a better position than the appellate judges to assess the probable reactions of jurors." *Bruscino*, 687 F.2d at 941. We will not reverse "unless we have a very strong conviction of error." *Id.*; see also *United States v. Berry*, 92 F.3d 597, 602 (7th Cir. 1996) ("These are relatively unique facts and ones that do not necessarily give the impression of unfair prejudice. However, our deferential review leads us to the conclusion that, in light of the record, the district court did not abuse its discretion in granting the motion for a new trial."). Whether the court grants or denies a new trial, we ask whether "any reasonable person could agree with the district court" and affirm if so. *Best*, 939 F.2d at 429, quoting *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1201 (7th Cir. 1989).

C.  *The District Court Did Not Abuse Its Discretion*

Several factors persuade us there was no abuse of discretion here. First, as the district court noted, there was overwhelming evidence of Coney's guilt. See *United States v. Paneras*, 222 F.3d 406, 411 (7th Cir. 2000) (overwhelming evidence of guilt was "a factor which militates against" finding that a new trial was needed after jury saw arguably prejudicial information). A total of six women provided consistent testimony that Coney trafficked or attempted to traffic them while they were minors. The defense tried to impeach their credibility through cross-examination, but the district judge called their testimony "vivid" and "compelling," and the jury seems to have agreed. Plus, to agree with Coney's defense theory that he engaged "only" in violent robberies would have required jurors to believe the victims' testimony about a few robberies yet not believe those same victims' testimony that

far more encounters with customers involved actual prostitution.

In addition to the victim testimony, text messages written by Coney discussed facilitating prostitution without mention of robbery. For instance, Coney messaged his underage girlfriend (who testified that she engaged in prostitution controlled by him) urging her to get another girl "to sell [her body]" and become involved in the prostitution scheme. In another message, Coney said "I got at least five hoes cashing me out," matching the number of victims who testified that he pimped them. Coney did not introduce any messages or evidence corroborating his claim that he always robbed those who responded to the Backpage.com advertisements rather than allow the agreed-upon prostitution to take place. His defense was to ask the jury to believe, based on impeachment of the victim witnesses, that they were lying—but only in part—and that, despite the appearance of his conduct, his minor victims *never* actually exchanged sex for money.

Second, it was not an abuse of discretion for the district court to find no reasonable possibility that the evidence at issue affected the jury's verdict given how few messages and photographs were identified by defense counsel as even possibly prejudicial. Those few messages and photographs were contained among a massive number of pages given to the jury for a short period of time. The jury spent less than three hours deliberating before the judge ordered the laptop computer removed from the jury room. Of the over 5,000 pages of material incorrectly provided to the jury, about half of those pages contained metadata and unreadable content. The defense briefing submitted over the weekend after the error was discovered noted that "considering the volume of the materials" and

quick briefing turn around, "Coney does not have enough time to go through all of the unfair prejudice" that could exist in the documents. Likewise, with a maximum of three hours in the room with the evidence on one laptop computer, it would not have been feasible for jurors to see, let alone absorb, more than a fraction of the messages and photographs. The final number of messages and photographs identified by the defense as unfairly prejudicial was also low, as discussed next.[3]

The third reason we are comfortable affirming the denial of a new trial is that the court carefully analyzed each category of challenged evidence and explained why the evidence would be unlikely to have swayed a juror in this case. Defense counsel found four photographs containing guns. Of those four, one of Coney holding a gun with his arm around his underage girlfriend was properly shown to the jury during trial. The district court found little risk of prejudice from the other three photographs because evidence properly shown to the

---

[3] As we noted during oral argument, it would have been helpful to know which digital documents the jurors opened and viewed during deliberations. While Rule of Evidence 606(b) prohibits the court from questioning jurors about "the effect of anything on that juror's or another juror's vote," the rule explicitly allows for questioning jurors about "whether … extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(1) & (b)(2)(A). Rule 606 would not have barred an inquiry into which files the jury opened and which pages they viewed during deliberations. This line of inquiry might have revealed that there was no possibility that the jury saw the challenged evidence or focused attention on particular items of problematic evidence. See *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 917 (7th Cir. 1991) (explaining that under Rule 606(b), judge could ask limited questions to learn whether alleged outside communication was made and what its contents were).

jury indicated that Coney had held a gun and was generally "armed and violent."

Similarly, the defense identified five text messages— among the thousands of pages of evidence—in which Coney threatened violence. Some of those messages were threatening his underage girlfriend, who testified at trial about how he had beaten her. In fact, the prosecution showed the jury a photograph of her injured face. Coney did not deny any of this violence. He argued instead that although he committed domestic violence against this girl, it was unrelated to the alleged prostitution. None of the identified messages said anything about prostitution. While these messages should not have ended up in the jury's hands, the district court reasonably concluded that they would not have affected the verdict even if the jurors had seen them.

The district court also concluded that the twenty-two suggestive photographs of young women of unknown ages on Coney's phone were unlikely to affect the jury's perception of Coney's guilt. The jury had properly seen the Backpage.com listings that Coney admitted he had created using explicit photographs of girls who he knew were underage. Similarly, the browser history on Coney's phone showing views of pornography was "simply too minor" to have affected a verdict in a trial where five victims testified that Coney trafficked them for sex while they were minors, and where Coney himself admitted to using those girls and explicit Backpage.com postings of them as bait to rob purported prostitution clients.

Next, the judge concluded that the one text message that the defense argued referred to drugs and possible drug dealing was not sufficiently prejudicial to merit a new trial. The jury had already heard "ample evidence at trial that Coney

and the victims smoked a lot of marijuana." The judge also considered several improperly shared messages suggesting that Coney and his underage girlfriend were HIV-positive. The jury had already heard testimony and seen proper evidence at trial indicating that Coney had lied to his underage girlfriend and others saying that she had transmitted HIV to him. The court found the related messages unlikely to have affected deliberations.

The defense also identified two text messages among the thousands of pages of phone data from Coney's underage girlfriend saying that he showed her "how to sell" herself. The court did not find these messages likely to affect the jury's verdict given the far more extensive testimony (including from this girlfriend) and evidence of sex-trafficking presented throughout the trial.

These assessments of the evidence by the district court were eminently reasonable. They were certainly not outside the bounds of the district court's sound discretion based on its familiarity with the trial. Of the evidence improperly provided to the jury, nothing stood out individually or cumulatively as providing the jury with damaging information about Coney that the jury did not already learn during the trial. The items that the defense highlighted as most prejudicial were few and far between in a sea of thousands of documents. It is unlikely the jurors had time to view this evidence and, even if they did, it was largely in line with conduct Coney had admitted at trial.

Given the deference owed to the district court, the overwhelming evidence of guilt, and the low likelihood that the jurors actually saw the challenged messages and photographs in the mass exhibits improperly provided to them for a few

hours, the district court did not err in denying Coney's motion for a new trial. The judgment of the district court is

AFFIRMED.